UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | x | |
| YI XIANG, Individually and on Behalf of All Others Similarly Situated, | : : : | Civil Action No. 1:16-cv-04923-VM **(Consolidated)** |
| Plaintiff, | : : | <u>CLASS ACTION</u> |
| vs. | : : : | CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 |
| INOVALON HOLDINGS, INC., KEITH R. DUNLEAVY, THOMAS R. KLOSTER, DENISE K. FLETCHER, ANDRÉ S. HOFFMANN, LEE D. ROBERTS, WILLIAM J. TEUBER JR., GOLDMAN SACHS & CO., MORGAN STANLEY & CO. LLC, CITIGROUP GLOBAL MARKETS INC., MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED, UBS SECURITIES LLC, PIPER JAFFRAY & CO., ROBERT W. BAIRD & CO. INCORPORATED, WELLS FARGO SECURITIES, LLC AND WILLIAM BLAIR & COMPANY, L.L.C., | : : : : : : : : : : : : : : : : | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | : : : | |
| | x | |

1217073_2

Lead Plaintiff Roofers Local No. 149 Pension Fund ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Inovalon Holdings, Inc. ("Inovalon" or the "Company"), as well as media and analyst reports about the Company and Company press releases and earnings call transcripts.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of all those who purchased Inovalon Class A common stock in or traceable to the February 2015 Registration Statement and Prospectus (collectively, the "Registration Statement") issued in connection with Inovalon's February 12, 2015 initial public offering (the "IPO").  The action asserts claims under §§11, 12(a)(2) and 15 of the Securities Act of 1933 ("1933 Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the 1933 Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].  Jurisdiction is conferred by §22 of the 1933 Act [15 U.S.C. §77v].

3.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) and §22 of the 1933 Act because many of the acts and practices complained of herein occurred in substantial part in this District, Defendants are found or transact business in this District, Inovalon shares are listed and

- 1 -

trade on the NASDAQ stock exchange in this District and the Underwriter Defendants (defined below) maintain their headquarters in this District and conducted the IPO and IPO roadshow in large part from this District.

## PARTIES

4.      Lead Plaintiff purchased Inovalon shares traceable to the IPO, as set forth in its certification which was previously filed in this action and is incorporated herein by reference, and was damaged thereby.

5.      Defendant Inovalon provides cloud-based data analytics platforms for health insurance plans, pharmaceutical companies, researchers and others in the healthcare industry.

6.      Defendant Keith R. Dunleavy, M.D. ("Dunleavy") serves as Inovalon's Chief Executive Officer and the Chairman of Inovalon's Board of Directors ("Board").

7.      Defendant Thomas R. Kloster ("Kloster") served as Inovalon's Chief Financial Officer.

8.      Defendants Denise K. Fletcher, André S. Hoffmann, Lee D. Roberts and William J. Teuber Jr. serve as members of Inovalon's Board.

9.      The defendants named in ¶¶6-8 are referred to herein as the "Individual Defendants." The Individual Defendants each signed the Registration Statement, as defined herein, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO, as defined herein, and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential Inovalon investors, all motivated by their own and the Company's financial interests.

10.      Defendants Goldman Sachs & Co., Morgan Stanley & Co. LLC, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Inc. and UBS Securities LLC, are financial

- 2 -

services companies that acted as underwriters for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Inovalon common stock issued pursuant thereto. These defendants are referred to herein as the "Underwriter Defendants." The Underwriter Defendants, each of which is headquartered in this District, acted as co-lead bookrunning managers in the IPO. Pursuant to the 1933 Act, the Underwriter Defendants are liable for the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the IPO and shared in more than $40.5 million in fees collectively. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from Inovalon, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

(b)     The Underwriter Defendants also demanded and obtained an agreement from Inovalon and the Individual Defendants that Inovalon would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Inovalon had purchased millions of dollars in directors' and officers' liability insurance.

(c)     Representatives of the Underwriter Defendants also assisted Inovalon and the Individual Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business and operations of Inovalon, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Inovalon's operations and financial prospects.

- 3 -

(d)     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with Inovalon's lawyers, management and top executives and engaged in "drafting sessions" between at least October 2014 and February 2015.  During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Inovalon stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Inovalon would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Inovalon's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, Inovalon's existing problems as detailed herein.

(e)     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Lead Plaintiff and the other members of the Class.

11.     The Individual Defendants, together with Inovalon and the Underwriter Defendants, are collectively, "Defendants."

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

12.     Defendant Inovalon is a technology company providing cloud-based data analytics platforms to health insurance plans, pharmaceutical companies, researchers and others in the healthcare industry.

13.     The Company describes its platforms as capable of  accumulating and analyzing a wide range of disparate healthcare data such as claims, laboratory, pharmacy, medical benefits,

- 4 -

demographic information, provider information and facility information. According to the Company, applying large proprietary datasets, advanced data integration technologies and sophisticated predictive analytics, Inovalon's platforms identify gaps in care, quality, data integrity and financial performance, purporting to provide its clients with capabilities to resolve the identified gaps, and provide data summary and benchmarking to help its clients comply with government and regulatory reporting requirements.

14.    Defendant Inovalon markets its platforms as having the ability to receive, seamlessly integrate and accurately process extremely large-scale data flows efficiently and at high speeds, and to aggregate, integrate and analyze data in massive scale for its customers, including healthcare payors (*e.g.*, health plans and integrated health delivery systems), clinical providers (*e.g.*, hospitals, accountable care organizations, and physicians), pharmaceutical and life sciences companies, and consumers. During 2014, Inovalon is said to have provided services to more than 100 clients across approximately 200 patient populations nationwide, providing analytics on more than 754,000 physicians, 248,000 clinical facilities, 120 million unique patients (covering approximately 98.2% of all U.S. counties) and 9.2 billion discrete entries relating to patient interactions, medical procedures or changes in patients' medical conditions.

**The IPO**

15.    On or about October 10, 2014, Inovalon filed a draft Registration Statement on Form S-1 with the SEC, which would be used for the IPO following a series of amendments in response to SEC comments.

16.    On February 10, 2015, Inovalon filed its final amendment to the Registration Statement, which registered 25,555,555 shares of Inovalon common stock for public sale. The SEC declared the Registration Statement effective on February 11, 2015. On or about February 12, 2015,

Inovalon priced the IPO at $27 per share and filed the final Prospectus for the IPO, which forms part of the Registration Statement.

17.     On February 18, 2015, the Company completed the IPO, which, upon the underwriters' exercise of their option to purchase additional shares, issued and sold a total of 25,364,803 shares, generating over $684 million in gross proceeds.

18.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact and omitted to disclose material information that was required to be disclosed pursuant to the regulations governing its preparation.  As detailed further herein, the Registration Statement failed to disclose that Inovalon derived significant revenues from New York-based customers and that, as a result of recent New York tax law changes, would be subject to substantially increased taxes such that its effective tax rate would materially increase and its earnings would be negatively impacted.

**By the time of the IPO, NY State Had Adopted**
**Tax Law Changes that Subjected Out-Of-State Companies to**
**Increased Tax and NYC Would Soon Pass Similar Tax Law Change**

19.     On March 31, 2014, New York Governor Andrew Cuomo ("Governor Cuomo") signed into law legislation implementing a massive corporate tax reform that would take effect on January 1, 2015.  The State of New York corporation tax reforms expanded New York's use of bright-line statutory nexus thresholds, instituted combined reporting based on the unitary business principle and expanded the use of market sourcing of receipts to a full range of service industries. One of the primary objects of the State of New York tax reforms was to ensure that out-of-state companies that derived substantial revenues in the State of New York also paid their fair share of the State of New York taxes.

1217073_2

20.     Via this bill, New York dramatically increased the number of corporations that were subject to its corporate tax by adopting the economic nexus standard.  In addition to the physical presence nexus provisions then-currently contained in New York tax law, otherwise "out of state" corporations would now be subject to corporate taxes in New York if they were "deriving receipts from activity in [New York.]"  N.Y. Tax Law §209.1(a).[1]  A corporation would be deemed to derive receipts from an activity in New York if it had $1 million or more in New York receipts.  N.Y. Tax Law §209.1(b).  For purposes of this provision, New York receipts were defined as the receipts included in the numerator of the corporation's apportionment factor.  *Id*.

21.     Upon enactment of the legislation, tax and accounting professionals issued analyses of the proposed corporate tax reform to their clients.  Inovalon's outside independent auditors were Deloitte & Touche LLP ("Deloitte").  As a Deloitte client, Inovalon would have received Deloitte's 2014 State of New York tax alert.  The alert's "Summary of Major Reforms" expressly highlighted that the State, through the new bill, was "[a]dopting broad-based bright-line statutory nexus thresholds" to trigger the State of New York corporate tax obligations on otherwise "out of state" firms like Inovalon.

22.     On January 12, 2015, still well before the IPO, New York City ("N.Y.C.") Mayor Bill de Blasio ("Mayor de Blasio") issued a press release announcing "*a major reform of New York City's corporate tax structure*," designed to streamline N.Y.C. and the State of New York corporate tax reporting.  The release stated, in pertinent part, as follows:

> Certain New York City corporate tax provisions have not been reformed since the 1940s and reflect an outdated financial regulatory structure.  The City reforms announced today recognize the realities of the modern marketplace and treat firms consistently.

---

[1]     All citations omitted and emphasis added throughout, unless stated otherwise.

- 7 -

\*     \*     \*

"These are common sense reforms that will modernize and streamline a corporate tax code that hasn't seen real changes since the 1940s – serving taxpayers, businesses, and the City alike," said Mayor Bill de Blasio.

\*     \*     \*

"New York City has crafted a thoughtful approach to corporate tax reform, updating its taxes to facilitate compliance and doing that in a way that both levels the playing field among large businesses and maintains revenue neutrality.  The City aims to reduce taxes on small businesses and manufacturers, while ***making sure that large businesses pay a fair share***," said James Parrott, Deputy Director and Chief Economist at the Fiscal Policy Institute.

23.     According to an announcement made that same day by Jacques Jiha, N.Y.C.'s Commissioner of Finance, a primary purpose of the proposal was for N.Y.C. to make it more difficult for companies to shift income from N.Y.C. to places with lower tax rates.  As reported by the *Wall Street Journal* on January 12, 2015, "the city [was] proposing a variety of changes, including a new standard to determine how companies account[ed] for net income that [was] based on where a firm's markets [were] located, rather than the location of its business operations," such that "[c]ompanies with at least $1 million in receipts from sales to New York customers [would] trigger . . . a 'nexus' for business income taxes" purposes.

24.     Once again on this legislative news, tax and accounting professionals issued analyses of the proposed N.Y.C. corporate tax reform to their clients.  As a Deloitte client, Inovalon would have received Deloitte's January 23, 2015 client alert entitled "New York City proposes corporate tax reform."  The Deloitte partner who signed off on Deloitte's "Consent of Independent Registered Public Accounting Firm" authorizing defendants to include Deloitte's October 10, 2014 report relating to Inovalon's 2014 financial statements in the Registration Statement would also have seen this Deloitte client alert and Deloitte's earlier 2014 State of New York tax alert.  The January 2015 Deloitte client alert stated, in pertinent part, as follows:

- 8 -

On January 12, 2015, New York City Mayor Bill de Blasio proposed major reforms of the New York City corporate tax structure.  The proposed reforms were included in Governor Cuomo's 2015-2016 Executive Budget released on January 21, 2015.  If enacted into law, the proposed reforms would bring the New York City General Corporation Tax into substantial conformity with the New York State corporate franchise tax reforms enacted in 2014.  ***However, unlike the State's enacted corporate reform, the New York City reform proposals do not contain an income tax rate reduction for all corporate taxpayers and do not call for the reduction and ultimate elimination of the alternative tax base on capital***. . . .  The reforms, as contained in the proposed draft legislation, are intended to be revenue neutral and, ***if enacted, are expected to be retroactive to January 1, 2015***.  In this Tax Alert we summarize the more significant proposed law changes.

### Proposed New York City Corporate Tax Reforms

The more significant proposed reforms to New York City's corporate tax structure include the following:

*     *     *

- ***Adopting a broad-based, bright-line nexus concept such that corporations with sales of $1 million or more to New York City customers during the tax year would be subject to tax***[.]

25.     Accordingly, by the time of the IPO, the State of New York had already changed its tax laws to, among other things, subject "out-of-state" companies that derived at least $1 million in receipts from business within the State of New York to higher tax rates at the state level.  Moreover, it was widely expected that N.Y.C. would soon follow suit and "out-of-state" companies would additionally be subject to higher tax rates at the city level and this change would be retroactive to January 1, 2015.

26.     On April 1, 2015, N.Y.C. proposed tax reform was passed by the State of New York legislature and signed by Governor Cuomo on April 13, 2015.  As expected prior to the IPO, the newly enacted N.Y.C. tax rates applied, retroactive to January 1, 2015, to companies such as Inovalon doing business within N.Y.C.

**The Registration Statement Omitted Material Information
Required to Be Disclosed Therein**

27.     The Registration Statement negligently failed to identify and disclose known trends, events, demands, commitments and uncertainties that were then having and were reasonably likely to have a material effect on Inovalon's operating performance.

28.     Item 11 of Form S-1 required the Registration Statement to furnish the information called for under SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A").  As set forth in the December 29, 2003 interpretative release to Item 303 of Regulation S-K issued by the SEC (the "2003 Interpretive Release"), the purpose of MD&A is to provide investors with information necessary to an understanding of a company's results of operations, including the identification and disclosure of known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on a company's operating performance.

29.     The instructions to Item 303(a) of Regulation S-K required that the Registration Statement provide disclosure about and "focus specifically" on material events and uncertainties that would cause Inovalon's reported financial information not to be necessarily indicative of future *operating results*, including "matters that would have an impact on future operations and [matters that] have not had an impact in the past" stating, in pertinent part, as follows:

>      The discussion and analysis shall ***focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results*** or of future financial condition.  ***This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past***, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

30.     The 2003 Interpretive Release also provides that the Registration Statement was required to provide disclosure about known demands, events or uncertainties, except for those that

- 10 -

management determined: (i) were not reasonably likely to occur; or (ii) would not have a material effect on Inovalon's operating results.  The 2003 Interpretive Release states, in pertinent part, as follows:

> As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty ***is required unless*** a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.

31.     Here, at the time of the IPO, Defendants knew that Inovalon was generating significant revenues from New York-based customers and that as a result of recent New York tax law changes, would be subject to substantially increased taxes such that its effective tax rate would materially increase and its earnings would be negatively impacted.  The Registration Statement, however, failed to disclose that: (i) Inovalon was deriving significant revenues from New York-based customers; and (ii) as a result of recent New York tax law changes, would be subject to substantially increased taxes such that its effective tax rate would materially increase.  Although investors could have been aware of the changes in New York tax law, they could not have known the amount of revenues that Inovalon generated from New York based clients, or therefore, the impact on Inovalon's finances.

32.     The Registration Statement also purported to warn of numerous risks, which, "if" they occurred, "***might***" or "***could***" adversely affect the Company while failing to disclose that these very "risks" had already materialized at the time of the IPO.  For example, the Registration Statement stated:

- "***[N]ew*** laws or regulations, or new interpretations of existing laws or regulations, applicable to our business" "***could*** cause fluctuations in the market price of our Class A common stock . . . ."

- "***[I]f*** our results of operations do not meet [securities analysts'] expectations, the share price of our Class A common stock ***could*** decline."

1217073_2

- "[We] *could* become subject to new, revised, or enhanced regulatory requirements in the future, which *could* result in increased costs, *could* delay or prevent our introduction of new services, or *could* impair the function or value of our existing services, which *could* materially and adversely affect our results of operations and growth prospects."

33.     These statements were inaccurate statements of material fact because they failed to disclose that Inovalon was already subject to higher corporate tax rates in states where it did substantial business such as New York, it was then deriving at least a million dollars per year in revenues from New York based customers and would have to pay increased tax and its effective tax rate had materially increased.

34.     Furthermore, under the rules and regulations governing the preparation of the Registration Statement, Inovalon was required to provide information called for by SEC Regulation S-K 229.503 ("Item 503").  Item 503 required, in the "Risk Factor" section of the Registration Statement, a discussion of the most significant factors that make the offering risky or speculative and that each risk factor adequately describes the risk.  Inovalon's discussions of risk factors did not even mention, much less adequately describe, the risk posed by the fact that Inovalon then received substantial revenues from New York-based customers and the resulting increase in Inovalon's effective tax rate and the then known material adverse impact on the Company's 2015 financial results and its future financial prospects.

**Post-IPO Events**

35.     The IPO was extremely lucrative for Inovalon and generated more than $680 million in gross proceeds.

- 12 -

1217073_2

36.     On March 25, 2015, Inovalon announced its fourth quarter and fiscal year ("FY")

2014 ("FY14")[2] results for the interim period ended December 31, 2014, stating in its press release

issued that day – *without explanation* – that its effective tax rate had increased to 40% for FY14,

well before the IPO.  During the earnings call Inovalon held with analysts and investors that evening,

Defendant Dunleavy provided 2015 annual net income guidance, expressly emphasizing the impact

that the Company's effective tax rate had on its financial guidance, which he explained was material

to investors' understanding of the Company's business and financial prospects, stating, in pertinent

part, as follows:

> *In an effort to inform models regarding the Company's projections and otherwise educate stockholders and others regarding the Company's 2015 guidance, the following information will hopefully be helpful*.  The Company's non-GAAP net income and related non-GAAP diluted net income per share guidance includes . . . and *an* effective tax rate of 40%.

37.     On March 31, 2015, Inovalon filed its annual report on Form 10-K for FY14 with the

SEC.  The 10-K stated that Inovalon's "*effective income tax rate in 2014 was 40% compared to*

*38% in 2013*," disclosing that the "increase in [its] effective income tax rate was due primarily to *an*

*increase in [its] effective state income tax rate*."  However, this statement significantly understated

the full impact of the State of New York and N.Y.C. corporate tax rate increases that had gone into

effect on January 1, 2015.

38.     On May 6, 2015, after the close of trading, Inovalon announced its 1Q15 financial

results for the quarter ended March 31, 2015, *during which the IPO had been conducted*, stating –

*again without any explanation* – that the "Company's Non-GAAP net income and related Non-

GAAP diluted net income per share guidance [now] include[d] *a revised effective tax rate estimate*

---

[2]      Inovalon's fiscal quarters are abbreviated by quarter and year.  For example, 4Q14 represents fourth quarter of FY 2014.

*of 41%*, an increase from the Company's ***initial 2015 guidance of 40%***."  During the earnings call held with investors that evening, defendant Dunleavy reiterated the effective tax rate being used to provide the 2015 guidance, stating, in pertinent part, that the "guidance include[d] ***a revised effective tax rate estimate of 41%, an increase of 1% from the Company's initial 2015 guidance of 40% even***."  Defendant Dunleavy provided no further explanation concerning the tax rate increase.

39.     When the Company filed its quarterly financial report on Form 10-Q for 1Q15 with the SEC on May 8, 2015, the Company confusingly disclosed that rather than an effective tax rate of 41%, as had been provided in the May 6, 2015 press release and during the investor earnings call held that same evening, "[d]uring the three months ended March 31, 2015, [the Company's] provision for income taxes increased by approximately $1.1 million, or 12%, compared to the three months ended March 31, 2014," stating that the "increase was primarily driven by ***the effective tax rate of 43% for the three months ended March 31, 2015*** compared to 39% in the same period of the prior year."  The Form 10-Q now further stated that the "increase in [the Company's] effective tax rate for the three months ended March 31, 2015 was attributable to a ***$0.6 million increase in expected state income taxes***, net of federal income tax effect, ***driven by unfavorable state legislative changes*** as well as a state deferred tax expense adjustment of $0.5 million."

40.     Indeed, few – if any – in the investment community took notice of the increase in the Company's reported effective tax rate for the 1Q15 because the Company had not yet explained the extent of the corporate tax rate increases or disclosed that due to those corporate tax rate increases, the Company was cutting its FY15 earnings and earnings per share ("EPS") guidance.  For example, when Underwriter Defendant UBS's Steven Valiquette ("Valiquette") published a research report on the Company on June 1, 2015 affirming his $35 per share price target, his financial modeling still included a 41% effective tax rate for the Company for FY15.

41.     On August 5, 2015, after the markets closed, Inovalon issued a press release announcing its 2Q15 financial results for the interim period ended June 30, 2015. The release finally disclosed the negative impact the State of New York and N.Y.C. corporate tax reforms had on Inovalon's FY15 earnings and lowered the Company's 2015 earnings forecast accordingly. The release stated, in pertinent part, as follows:

> ***Tax Rate Change: During the quarter, New York City enacted corporate tax reform legislation retroactive to January 1, 2015 which increased the Company's effective tax rate by 1.7% and 1.1% for the three and six months ended June 30, 2015, respectively. This legislation negatively impacted Non-GAAP diluted net income per share during the quarter by $0.01. The cumulative effect of tax legislation modifications are expected to negatively impact the full year Non-GAAP diluted net income per share for 2015 by approximately $0.03***.

42.     In addition to the increased effective tax rate lowering the Company's reported 2Q15 GAAP earnings per share by $0.01, the release disclosed that the Company was also finally reducing its FY15 earnings guidance due to the "***increase in the effective tax rate from 41% to 43%***." Non-GAAP net income would now come in between $75 million and $80 million, down from the range of $80 million to $85 million provided on March 25, 2015, and Non-GAAP diluted net income per share would come in between $0.51 and $0.54, down from the range of $0.54-$0.57 provided on March 25, 2015.

43.     During the earnings call held with investors that evening, Defendant Kloster stated that the State of New York and N.Y.C. corporate tax reforms had reduced the Company's GAAP earnings per share by $0.01 in 2Q15 and had significantly increased the Company's effective tax rate going forward to 43%, stating, in pertinent part, as follows:

> [W]e continue to see various states and municipalities implement revised methodologies for corporations to apportion their income to their respective states and municipalities. ***These new legislative acts have resulted in a significant increase in our effective tax rates versus original expectations entering the year***. In Q2, New York City enacted new legislation which was retroactive back to January 1, 2015. ***This legislation alone, increased our effective tax rate during the second***

- 15 -

***quarter by 1.7% and lowered our earnings per share by $0.01 in the second quarter.***

> ***The tax legislation changes over the course of the year have altered our effective tax rate to be 43% for the full year, versus our original expectations of 40% and have reduced our earnings per share estimates by $0.03 for the full year.*** We are actively considering methods to reduce our effective tax rate, but any action we may take is not expected to have an effect on 2015.

44.    Asked later in the earnings call about the potential methods the Company was "considering" to "reduce" its "effective tax rate" as Defendant Kloster had alluded to above, defendant Kloster finally admitted that New York was one of Inovalon's most "***significant . . . high rate states***," and that the Company was "actively" attempting to manage its State of New York and N.Y.C. taxes, stating, in pertinent part, as follows:

> [Analyst:] . . . Tom, you – I think you mentioned Inovalon's exploring some methodologies to produce a tax rate.  Can you give us a sense for what strategies you may be considering?  And, if you execute those strategies, how big of an impact that would have on your tax rate?

> [Kloster:]  Yes, Matt.  I certainly can.  Our effective tax rate, which now is 43% for the full year.  Is really driven by the state considerations.  And, that's what happened in Q2.

> As various states and municipalities are changing the methodology of how we apportion income into their respective states.  So, we are exploring.  I think it's premature to comment that there's anything that we're going to do that would lower that effective tax rate.  Some of it will just happen naturally.  Based on a dispersion of our clients and where those clients are.  So, ***most of our significant states, or, at high rate states, have already changed their methodologies***.

> So, we shouldn't see too much more effect of any further changes.  But, ***we are actively looking at various alternatives***.

45.    On this news, the price of Inovalon shares plummeted $7.62 per share, ***or 30%***, from a close of $25.40 per share on August 5, 2015 to trade as low as $17.78 per share in intra-day trading on August 6, 2015, on unusually high trading volume of more than 2.2 million shares trading, or more than seven and a half times the average daily volume over the preceding ten trading days.

46.     Market analysts slashed their forecasts and share price targets for Inovalon.  In his August 5, 2015 report, Underwriter Defendant UBS's Valiquette lowered his price target from $35 down to $32 emphasizing that "EPS was lowered to $0.51-$0.54 EPS due to a higher tax rate," causing the firm to lower its own fiscal 2015 EPS target "on the higher tax."  In its August 6, 2015 report, underwriter Piper Jaffray's Sean W. Wieland stated that "Inovalon missed revenues and EPS on contract slippage and a higher tax rate . . . .  [This] is not a positive . . .  We are lowering our PT to $24 [from $31] . . . ." Underwriter William Blair's Ryan Daniels' and Jeffrey Garro's August 5, 2015 report lowered their "adjusted EPS" target "down two cents year-over-year" to $0.53 "solely due to increased tax-rate assumptions . . . ."  Underwriter Wells Fargo's Jamie Stockton's, Stephen Lynch's and Nathan Weissman's August 5, 2015 report also noted that "EPS came down a few cents on taxes" causing them to reduce their 2015 EPS target by "$0.04 to $0.53" and their 2016 EPS target by "$0.05 to $0.67, *mostly on taxes*."  Later in their report they emphasized that "[s]tates [had] started to hike tax rates, which hurt INOV to the tune of $0.01 in the quarter."  They also stated that the "only adjustment to 2015 guidance was an increase in the tax rate from 41% to 43%, which took the EPS outlook down to $0.03," stating that "[w]hile the company is working on ways to negate that in the future years, *we are assuming it is permanent for now*."

47.     At the commencement of this action, Inovalon shares trade at less than $18 per share, more than one-third lower than the IPO price and now trade in a range of $9.00 - $10.00 per share.

## CLASS ACTION ALLEGATIONS

48.     Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all those who purchased Inovalon Class A common stock in or traceable to the Registration Statement issued in connection with the IPO (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors and affiliates of

Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

49.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Inovalon or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

50.     Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the 1933 Act;

(b)     whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

- 18 -

1217073_2

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

53.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §11 of the 1933 Act
### Against All Defendants

54.      Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

55.      This Count is brought pursuant to Section 11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

56.      The Registration Statement was inaccurate and contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not inaccurate and omitted to state material facts required to be stated therein.

57.      Inovalon was the registrant for the IPO.  As the issuer of its common stock, Inovalon is strictly liable to Lead Plaintiff and the Class for the materially inaccurate statements in the Registration Statement and the failure of the Registration Statement to be complete and disclose the material information required pursuant to the regulations governing its preparation.

58.      The Individual Defendants signed the Registration Statement either personally or through an attorney-in-fact and caused its issuance.  Each of the Individual Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements

contained in the Registration Statement.  The Individual Defendants had a duty to ensure that such statements were true and accurate, and that there were no omissions of material facts that would make the statements in the Registration Statement inaccurate.  By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained inaccurate misrepresentations and/or omissions of material fact.  As such, the Individual Defendants are strictly liable to Lead Plaintiff and the Class.

59.     The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement for the IPO was prepared properly and accurately.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.  As such, the Underwriter Defendants are strictly liable to Lead Plaintiff and the Class.

60.     The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.  None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not inaccurate.  By reasons of the conduct herein alleged, each Defendant violated and/or controlled a person who violated §11 of the 1933 Act.

61.     At the time of its purchase of Inovalon shares, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Lead Plaintiff commenced this action.  Less

than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Lead Plaintiff commenced this action.

62.     As a result of Defendants' violations, the value of Inovalon shares declined substantially and therefore Lead Plaintiff and the Class have sustained damages.

## COUNT II

### For Violation of §12(a)(2) of the 1933 Act
### Against All Defendants

63.     Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

64.     This Count is brought pursuant to §12(a)(2) of the 1933 Act, 15 U.S.C. §77l(a)(2), on behalf of Lead Plaintiff and the Class, against all Defendants.

65.     Defendants were sellers and offerors and/or solicitors of purchasers of the securities offered pursuant to the Registration Statement and Prospectus.  Defendants issued, caused to be issued and/or signed the Registration Statement in connection with the IPO.  The Registration Statement contained a Prospectus that was used to induce investors, such as Lead Plaintiff and the other members of the Class, to purchase the stock offered by Inovalon.

66.     The Underwriter Defendants participated in the preparation and dissemination of the defective and inaccurate Prospectus for their own financial benefit.  But for their participation in the IPO, including their solicitation as set forth herein, the IPO could not and would not have been accomplished.  Specifically, the Underwriter Defendants:

(a)     made the decision to conduct the IPO and do it at the price set forth in the Prospectus.  The Underwriter Defendants drafted, revised and/or approved the Prospectus and participated in its being declared effective by the SEC.  The Prospectus was calculated to create

- 21 -

1217073_2

interest in Inovalon common stock and was widely distributed by or on behalf of the Underwriter Defendants for that purpose; and

(b)      conceived and planned the IPO and orchestrated all activities necessary to effect the sale of this stock to the investing public, by issuing stock, promoting the stock and supervising their distribution and ultimate sale to the investing public.

67.      As set forth above, the Registration Statement and Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading and omitted to state material facts required to be stated therein.  Defendants' actions of solicitation included preparing the defective and inaccurate Prospectus and participating in efforts to market the IPO to investors.

68.      Defendants owed the purchasers of Inovalon stock, including Lead Plaintiff and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus and to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact.  Defendants, in the exercise of reasonable care, should have known that the Registration Statement and Prospectus contained misstatements and omissions of material fact.

69.      Lead Plaintiff and the other members of the Class purchased Inovalon shares pursuant to the Registration Statement and Prospectus, and neither Lead Plaintiff nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in the Registration Statement and Prospectus.

70.      By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the 1933 Act.  Accordingly, Lead Plaintiff, individually and on behalf of the Class, hereby offers to tender to Defendants those shares of stock that Lead Plaintiff and the other Class members continue to own, in

return for the consideration paid for those shares together with interest thereon.  Class members who have sold their shares are entitled to rescissory damages.

## COUNT III

### For Violation of §15 of the 1933 Act
### Against Inovalon and the Individual Defendants

71.     Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

72.     This Count is brought pursuant to §15 of the 1933 Act, 15 U.S.C. §77o, on behalf of Lead Plaintiff and the Class, against Inovalon and the Individual Defendants.

73.     The Individual Defendants were controlling persons of Inovalon by virtue of their positions as directors and/or senior officers of Inovalon.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Inovalon.  The Company controlled the Individual Defendants and all of Inovalon's employees.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.     Awarding damages in favor of Lead Plaintiff and the Class against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages on Count II; and

- 23 -

1217073_2

E.      Such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Lead Plaintiff demands trial by jury.

DATED:  December 21, 2016              ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                       SAMUEL H. RUDMAN
                                       DAVID A. ROSENFELD


                                       _____s/ Samuel Rudman_____
                                              SAMUEL H. RUDMAN

                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)
                                       srudman@rgrdlaw.com
                                       drosenfeld@rgrdlaw.com

                                       ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                       SHAWN A. WILLIAMS
                                       DAVID W. HALL
                                       Post Montgomery Center
                                       One Montgomery Street, Suite 1800
                                       San Francisco, CA  94104
                                       Telephone:  415/288-4545
                                       415/288-4534 (fax)
                                       shawnw@rgrdlaw.com
                                       dhall@rgrdlaw.com

                                       Lead Counsel for Plaintiff

                                       SULLIVAN, WARD, ASHER & PATTON, P.C.
                                       MICHAEL J. ASHER
                                       1000 Maccabees Center
                                       25800 Northwestern Highway
                                       Southfield, MI  48075-1000
                                       Telephone:  248/746-0700
                                       248/746-2760 (fax)

                                       Additional Counsel for Plaintiff

- 24 -

1217073_2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 21, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on December 21, 2016.

s/ Samuel H. Rudman
SAMUEL H. RUDMAN

ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail: srudman@rgrdlaw.com

1217073_2

# Mailing Information for a Case 1:16-cv-04923-VM Xiang v. Inovalon Holdings, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **James R. Carroll**
  james.carroll@skadden.com,tholden@skadden.com,mlcbos@skadden.com

- **John J. Clarke , Jr**
  john.clarke@dlapiper.com,DocketingNewYork@dlapiper.com

- **William Scott Holleman**
  ScottH@johnsonandweaver.com,paralegal@johnsonandweaver.com,michaelf@johnsonandweaver.com

- **Joseph Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,jsnematzadeh@pomlaw.com

- **Hugh Jewett Marbury**
  hugh.marbury@dlapiper.com,DocketingNewYork@dlapiper.com,new-york-docketing-7871@ecf.pacerpro.com,hugh--marbury-2723@ecf.pacerpro.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Susan Leslie Saltzstein**
  ssaltzst@skadden.com

- **Marc Aaron Silverman**
  marc.silverman@dlapiper.com,DocketingNewYork@dlapiper.com,marcasilverman@gmail.com,new-york-docketing-7871@ecf.pacerpro.com,marc-silverman-6035@ecf.pacerpro.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)